IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. |
| v. | : | DATE FILED: |
| PETER BRAUNER | : | VIOLATIONS: |
| | | 18 U.S.C. § 666(a)(1)(A), (b) (theft from organization receiving federal funds - 1 count) |
| | : | 18 U.S.C. § 1343 (wire fraud - 1 count) |
| | : | 18 U.S.C. § 2 (aiding and abetting) Notices of forfeiture |
| | : | |

**INFORMATION**

**COUNT ONE**

THE UNITED STATES ATTORNEY CHARGES THAT:

**BACKGROUND**

At all times material to this information:

1. The Southeastern Pennsylvania Transportation Agency ("SEPTA") was a metropolitan transportation authority providing rail, trolley, and bus services to passengers within Philadelphia, Pennsylvania, and the surrounding counties as well as service between the states of Delaware and New Jersey.

2. SEPTA was an organization, and an agency of a state government, which received annual benefits in excess of $10,000 under federal programs involving grants, contracts, subsidies, loans, guarantees, and other forms of federal assistance.

3. SEPTA issued "procurement cards," also known as P-Cards, which operated as SEPTA credit cards, to management level employees working in SEPTA's Bridges and Buildings Department ("BBD"). The BBD was responsible for maintaining, repairing, and renovating SEPTA facilities throughout Philadelphia. SEPTA provided written rules and procedures to the BBD employees concerning the use of these cards.

4. SEPTA rules allowed the P-Cards to be used for legitimate business reasons to purchase materials and equipment for jobsites when there was an emergency need for those items and they were not available in SEPTA's stock system. Under SEPTA rules, most materials for a jobsite should have been purchased in advance of the project through the purchase order ("PO") process.

5. Consistent with the purpose of the P-Cards, SEPTA rules further limited the use of the cards. Beginning in or around 2017, the limits for individual P-Cards were (1) a maximum of $1,000 for a single transaction; (2) a maximum of $4,000 for daily purchases; and (3) no more than four transactions per day. Employees were not permitted to artificially break up purchases to hide violations of the rules, e.g., by making multiple smaller purchases to avoid crossing the $1,000 threshold, also known as "fragmenting." Prior to 2017, these limits were lower, *i.e.,* $500 for a single transaction and $2,000 for daily purchases.

6. Defendant PETER BRAUNER was a Maintenance Manager in SEPTA's BBD. In that position, he supervised other employees in the BBD.

7. Mark Irvello, charged elsewhere, was the owner and operator of MSI Tool Repair and Supply and AM Services and Supplies (collectively referred to here as "MSI"),

located at 7343 West Chester Pike in Upper Darby, Pennsylvania. MSI sold tools and other construction products to various customers, including SEPTA, through employees in the BBD.

       8.     Stanley Woloff, charged elsewhere, was the owner and operator of Advantage Industrial Supply ("AIS"), located at 2137 East Tioga Street in Philadelphia, Pennsylvania. AIS sold industrial supplies and other products to various customers, including SEPTA, through employees in the BBD.

      9.     David Abell, Rodney Martinez, Stephen Kish, Jesse Fleck, James Turner, and John Brady, all charged elsewhere, along with individuals known to the United States Attorney and identified here as Manager #1, Manager #2, Manager #3, and Manager #4, were managers in SEPTA's BBD. Defendant PETER BRAUNER, along with Abell, Martinez, Kish, Fleck, Turner, Brady, Manager #1, Manager #2, Manager #3, and Manager #4, were agents of SEPTA who were issued P-cards and were trusted to use those cards to make work-related purchases on behalf of SEPTA. These managers supervised numerous employees in the BBD and held the following positions:

      a.     David Abell was a Senior Director of Maintenance;

      b.     Rodney Martinez was a Senior Director of Maintenance;

      c.     Stephen Kish was a Director of Maintenance;

      d.     Jesse Fleck was a Director of Maintenance;

      e.     James Turner was a Maintenance Manager;

      f.     John Brady was a Maintenance Manager;

      g.     Manager #1 was a Maintenance Manager;

      h.     Manager #2 was a Maintenance Manager;

    i.  Manager #3 was a Maintenance Manager; and

    j.  Manager #4 was a Maintenance Manager.

## THE ORIGIN AND HISTORY OF THE FRAUD AND BRIBERY SCHEME

  10.  In or about 2013, David Abell separately agreed, first with Mark Irvello of MSI, and then with Stanley Woloff of AIS (collectively "the vendors"), to engage with each of them in a fraud and bribery scheme against SEPTA. Abell agreed with the vendors that the vendor would provide Abell with regular cash payments for Abell's personal benefit and that the vendor would falsely bill SEPTA through the P-Card system for items that the vendor was not providing to SEPTA. The false charges would cover the cash payments to Abell plus as much as double that amount to provide an equal share of fraud proceeds for the vendor.

  11.  David Abell and the vendors understood and agreed that the vendors would make these cash payments to Abell not only to generate fraud proceeds for themselves, but also to maintain and grow the vendors' business with SEPTA. As part of this understanding and agreement, Abell purchased goods for SEPTA from MSI and AIS and encouraged and directed other SEPTA managers and employees in the BBD, including those identified above in paragraph 9, to make purchases from MSI and AIS. Those managers and employees followed Abell's direction and made purchases from MSI and AIS.

  12.  After agreeing to engage in this scheme, David Abell regularly solicited and demanded cash payments from the vendors. Mark Irvello and Stanley Woloff then regularly provided cash to Abell, generally in amounts between $1,000 and $2,000 per month. The vendors then charged the P-Cards of SEPTA managers for numerous items that they did not

4

provide to SEPTA to cover the cash they gave to Abell and to generate substantial fraud proceeds for themselves.

13. David Abell identified for the vendors the items for which to charge SEPTA on the P-Cards to make the charges appear legitimate and conceal the fraud from SEPTA and authorities. Specifically, at Abell's direction, the vendors then billed SEPTA for products that SEPTA might use, but in fact, did not need at that time. Similarly, at Abell's direction, the vendors also billed SEPTA for products that they did provide to SEPTA, but billed SEPTA for substantially more of those products than they actually provided. The vendors thus combined legitimate with fraudulent billing, making the scheme difficult to detect.

14. Working with David Abell and other BBD managers, the vendors used the managers' P-Cards interchangeably to make it easier to generate fraud proceeds and bill SEPTA without exceeding the transactional limits on the individual P-Cards. The vendors thus used any manager's P-Card for transactions without regard for who was making a purchase or engaging in fraud with them.

15. Mark Irvello and Stanley Woloff provided David Abell with cash payments on a regular basis, approximately twice per month, from in or about 2013 until Abell left the employment of SEPTA on or about May 25, 2016.

16. Approximately one year before David Abell left the employment of SEPTA, he retired from his position as Senior Director of Maintenance and became a contractor for SEPTA, continuing to work in SEPTA's BBD as he did as a manager. SEPTA replaced Abell with Rodney Martinez, making Martinez the new Senior Director of Maintenance. Abell trained Martinez in his new position and introduced Martinez to the cash-payment aspect of the fraud

5

scheme.

17. Vendors Mark Irvello and Stanley Woloff then made regular cash payments to David Abell and Rodney Martinez and continued to falsely bill SEPTA for products that they did not provide to SEPTA, as described above. The false billing covered the cash payments to Abell and Martinez and provided fraudulent proceeds for the vendors.

18. Several other SEPTA BBD managers, including defendant PETER BRAUNER and those identified above in paragraph 9, engaged in similar fraud activity with vendors Mark Irvello and Stanley Woloff. Those managers solicited the vendors for cash and personal items at no cost to the SEPTA managers. The vendors agreed to provide the cash and personal items to the managers, and as the parties further understood and agreed, the vendors fraudulently billed SEPTA to cover the cost of those payments and products and to generate additional fraud proceeds for the vendors.

19. Vendors Mark Irvello and Stanley Woloff provided the cash and other items to the SEPTA managers as requested, both to generate fraud proceeds for themselves and to ensure that they continued to obtain and increase business from SEPTA.

From in or about 2013 through in or about 2019, vendors Mark Irvello and Stanley Woloff, through their companies, each became one of SEPTA's largest billers on the P-Card. In doing so, Irvello defrauded SEPTA of more than $540,000, and Woloff defrauded SEPTA of more than $330,000.

## THE DEFENDANT'S INVOLVEMENT IN THE SCHEME

20. In or about 2016, defendant PETER BRAUNER began to participate in the fraud scheme against SEPTA. Defendant BRAUNER separately asked both Mark Irvello and Stanley Woloff to provide him with personal products at no cost to defendant BRAUNER. Irvello and Woloff agreed to provide defendant BRAUNER with those personal products. Defendant BRAUNER and the vendors understood and agreed that the vendors would use the SEPTA P-Cards to fraudulently bill SEPTA for those personal products and generate additional fraud proceeds for the vendors, in the manner discussed above in paragraph 13.

21. From in or about 2016 through in or about 2018, as part of this scheme, defendant PETER BRAUNER obtained from Mark Irvello and Stanley Woloff numerous personal items that Irvello and Woloff fraudulently billed to SEPTA through the P-Card system. The total value of those products was at least $19,000, resulting in at least $33,000 in fraudulent billing to SEPTA. The products included, among others, a $5,600 backhoe attachment, a computer, a gas grill, and automobile parts.

22. From in or about 2016 through in or about 2018, in the Eastern District of Pennsylvania and elsewhere, defendant

**PETER BRAUNER,**

an agent of SEPTA, an organization, and an agency of a state government, which received annual benefits from 2016 through 2018 in excess of $10,000 under federal programs involving grants, contracts, subsidies, loans, guarantees, and other forms of federal assistance, knowingly embezzled, stole, obtained by fraud, and otherwise without authority, knowingly converted, to

the use of any person other than the rightful owner, and intentionally misapplied, and aided and abetted the embezzlement, stealing, obtaining by fraud, conversion, and misapplication of, property that was valued at more than $5,000 and was owned by, and under the care, custody, and control of SEPTA.

        In violation of Title 18, United States Code, Sections 666(a)(1)(A), (b) and 2.

## COUNT TWO

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

1. Paragraphs 1 through 22 of Count One of this information are incorporated here.

2. From in or about 2016 through in or about 2018, in the Eastern District of Pennsylvania and elsewhere, defendant

**PETER BRAUNER,**

alone and with co-schemers known to the United States Attorney, devised and intended to devise a scheme to defraud and to obtain money and property of SEPTA by means of false and fraudulent pretenses, representations, and promises.

3. On or about September 20, 2017, in the Eastern District of Pennsylvania and elsewhere, defendant

**PETER BRAUNER,**

alone and with co-schemers known to the United States Attorney, for the purpose of executing the scheme described above, and attempting to do so, knowingly caused to be transmitted by means of wire communication in interstate and foreign commerce signals and sounds travelling from Philadelphia, Pennsylvania, to Akron, New York, for Stanley Woloff's purchase of a "WM6600 back hoe attachment" from W.M. Power Equipment Company, for approximately $5,140 for defendant BRAUNER.

In violation of Title 18, United States Code, Section 1343.

## NOTICE OF FORFEITURE NO. 1

THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:

1. As a result of the violation of Title 18, United States Code, Section 666(a)(1)(A), (b), set forth in this information, defendant

### PETER BRAUNER

shall forfeit to the United States of America any property, real or personal, which represents or is traceable to the gross receipts obtained, directly or indirectly, as a result of such a violation, including, but not limited to, the sum of $19,646.

2. If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

   (a) cannot be located upon the exercise of due diligence;

   (b) has been transferred or sold to, or deposited with, a third party;

   (c) has been placed beyond the jurisdiction of the Court;

   (d) has been substantially diminished in value; or

   (e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property subject to forfeiture.

All pursuant to Title 18, United States Code, Section 982(a)(3)(A).

## NOTICE OF FORFEITURE NO. 2

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

1. As a result of the violation of Title 18, United States Code, Section 1343, set forth in this information, defendant

**PETER BRAUNER**

shall forfeit to the United States of America any property, real or personal, that constitutes or is derived from proceeds traceable to the commission of such violations, including, but not limited to, the sum of $19,646.

2. If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

    (a) cannot be located upon the exercise of due diligence;

    (b) has been transferred or sold to, or deposited with, a third party;

    (c) has been placed beyond the jurisdiction of the Court;

    (d) has been substantially diminished in value; or

    (e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other

property of the defendant up to the value of the property subject to forfeiture.

All pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 981(a)(1)(C).

_____
JENNIFER ARBITTIER WILLIAMS
ACTING UNITED STATES ATTORNEY

*No.*\_ \_ \_ \_ \_ \_ \_ \_ \_ \_

**UNITED STATES DISTRICT COURT**

Eastern District of Pennsylvania

<u>Criminal Division</u>

THE UNITED STATES OF AMERICA

vs.

PETER BRAUNER

**INFORMATION**
Count(s)

**18 U.S.C. § 666(a)(1)(A), (b) (theft from organization receiving federal funds - 1 count)
18 U.S.C. § 1343 (wire fraud - 1 count)
18 U.S.C. § 2 (aiding and abetting)
Notices of forfeiture**

A true bill.

_____
Foreman

Filed in open court this _____ day,
Of _____ A.D. 20 _____

_____
Clerk

Bail, $_____