IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 21-306 |
| PETER BRAUNER | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by its attorneys, Jennifer Arbittier Williams, United States Attorney for the Eastern District of Pennsylvania, and Louis D. Lappen, Deputy United States Attorney for the District, hereby submits its sentencing memorandum in the above-captioned case.

I.     **PRELIMINARY STATEMENT**

Defendant Peter Brauner abused the trust placed in him as a manager in SEPTA's Bridges and Buildings Department by engaging in a fraud scheme with SEPTA vendors that provided him with thousands of dollars in ill-gotten gains. While Brauner certainly did not originate the scheme, and was not one of the most culpable participants in the scheme, he took advantage of a criminal opportunity when it was presented to him. There was no excuse for this criminal behavior. He was a well-paid SEPTA manager and supervisor who should have known better. Considering the criminal activity of all the participants in this fraud scheme, the scheme cost SEPTA, under the most conservative estimates, almost $900,000 and did tremendous monetary and psychic damage to SEPTA,

its employees, and the citizens who fund SEPTA through the payment of taxes and ridership fares.

On the other hand, the defendant took appropriate steps to address his misconduct after he was confronted by the government. He has admitted to his misconduct, has shown remorse, and has agreed to pay full restitution at the time of sentencing. For these reasons and the reasons set forth in other sentencing documents, the government recommends a sentence below the advisory guideline range of 8-14 months in prison.

II.     SUMMARY OF THE CRIMINAL ACTIVITY

The charges in this case arose from the defendant's participation in a fraud and bribery scheme involving managers in the Bridges and Buildings Department ("BBD") of the Southeastern Pennsylvania Transportation Agency ("SEPTA") and vendors who supplied products to the BBD. The BBD is responsible for maintenance, construction, and rehabilitation work performed at various SEPTA locations. Several SEPTA managers in the BBD used their SEPTA-issued credit cards ("P-Cards") to defraud SEPTA by obtaining cash and personal products from vendors who supplied goods to SEPTA. To cover cost of the products and cash provided to SEPTA employees, the vendors billed SEPTA for products that the vendors did not provide to SEPTA. The vendors generally billed SEPTA as much as double the amount provided to the corrupt managers so they could share in the criminal proceeds. The vendors provided the cash and products to SEPTA managers for two reasons: (1) to generate and share fraud proceeds with the SEPTA managers; and (2) to maintain and increase business from SEPTA. The total loss

to SEPTA is approximately $900,000.

Among the different participants in this scheme, there were varying levels of conspiratorial activity and engagement with others. The guideline and other stipulations in Brauner's case, and in the cases of the other participants in the scheme, reflect each participant's role in the scheme and engagement with other participants. Brauner was a Maintenance Manager in SEPTA's BBD, supervising lower-level employees who performed maintenance work at SEPTA's facilities. Brauner participated in this scheme by obtaining approximately $19,646 in personal products from vendors that were fraudulently billed to SEPTA, resulting in approximately $33,050 in losses to SEPTA.

### A. General Background Facts

SEPTA is a metropolitan transportation authority providing rail, trolley, and bus services to passengers within Philadelphia, Pennsylvania, and the surrounding counties as well as service between the States of Delaware and New Jersey. SEPTA is an organization, and an agency of a state government, which received annual benefits in excess of $10,000 under federal programs involving grants, contracts, subsidies, loans, guarantees, and other forms of federal assistance. In fact, in each of the years of the charged fraud, SEPTA received well over $100 million from federal sources.

Throughout the time of the fraud discussed in this memorandum, SEPTA issued "procurement cards," also known as P-Cards, which operated as SEPTA credit cards, to managers working in SEPTA's BBD. The managers worked at various jobsites where SEPTA facilities were under construction for rehabilitation and renovation. SEPTA had

established written rules and procedures that were provided to these employees concerning the use of these cards.

SEPTA rules allowed the P-Cards to be used for legitimate business reasons to purchase materials and equipment for jobsites when there was an emergency need for those materials and equipment that were not available in SEPTA's stock system. Under SEPTA rules, most materials for a jobsite should have been purchased in advance of the project through the purchase order process. The SEPTA Procurement Card Procedures Manual ("the Manual") specifically provided that the procurement card program was "not an alternative to, nor is it intended to circumvent, the normal procurement policies and procedures."

Consistent with the purpose of the procurement cards, beginning in 2017, the Manual further limited the use of the cards to (1) $1,000 for a single transaction; (2) $4,000 for daily purchases; (3) and no more than four transactions per day. Employees were not permitted to artificially break up purchases to hide violations of the rules, e.g., by making multiple purchases to avoid crossing the $1,000 threshold, also known as "fragmenting." Prior to 2017, these limits were lower, *i.e.,* $500 for a single transaction and $2,000 for daily purchases.

### B. The Fraud Activity

#### 1. The Overall Scheme

For many years, beginning around 2013, SEPTA managers with the BBD engaged in a fraud and bribery scheme with particular SEPTA vendors to defraud SEPTA by

4

abusing SEPTA's P-Card system. The vendors provided SEPTA managers with cash and merchandise in exchange for vendors billing SEPTA for products that the vendors did not provide. The vendors shared in the proceeds of the fraud.

The two primary vendors involved in this fraud were MSI Tool Repair and Supply and AM Services and Supplies (collectively referred to here as "MSI") and Advantage Industrial Supply ("AIS"). SEPTA records show that MSI was the highest biller on the SEPTA P-cards. From 2010 through 2019, MSI billed SEPTA approximately $3.7 million for products and tool repair services. The third highest biller during this period was AIS, charging SEPTA $1.9 million for industrial supplies. MSI was owned and operated by Mark Irvello. AIS was owned and operated by Stanley Woloff. Both Irvello and Woloff are charged in related cases.

The scheme began around 2013 when David Abell (also charged in a related case) separately agreed, first with Mark Irvello of MSI, and then with Stanley Woloff of AIS (collectively "the vendors"), to engage with each of them in a fraud and bribery scheme against SEPTA. Abell agreed with the vendors that the vendor would provide Abell with regular cash payments for Abell's personal benefit and that the vendor would falsely bill SEPTA through the P-Card system for items that the vendor was not providing to SEPTA. The false charges would cover the cash payments to Abell plus as much as double that amount to provide an equal share of fraud proceeds for the vendor.

David Abell and the vendors understood and agreed that the vendors would make these cash payments to Abell not only to generate fraud proceeds for themselves, but also

to maintain and grow the vendors' business with SEPTA. As part of this understanding and agreement, Abell purchased goods for SEPTA from MSI and AIS and encouraged and directed other SEPTA managers and employees in the BBD, including Brauner, to make purchases from MSI and AIS. Those managers and employees followed Abell's direction and made purchases from MSI and AIS without necessarily knowing why they were encouraged to use these vendors.

After agreeing to engage in this scheme, David Abell regularly solicited and demanded cash payments from the vendors. Mark Irvello and Stanley Woloff then regularly provided cash to Abell, generally in amounts between $1,000 and $2,000 per month. The vendors then charged the P-Cards of SEPTA managers for numerous items that they did not provide to SEPTA to cover the cash they gave to Abell and to generate substantial fraud proceeds for themselves.

David Abell identified for the vendors the items for which to charge SEPTA on the P-Cards to make the charges appear legitimate and conceal the fraud from SEPTA and authorities. Specifically, at Abell's direction, the vendors then billed SEPTA for products that SEPTA might use, but in fact, did not need at that time. Similarly, at Abell's direction, the vendors also billed SEPTA for products that they did provide to SEPTA, but billed SEPTA for substantially more of those products than they actually provided. The vendors thus combined legitimate with fraudulent billing, making the scheme difficult to detect.

Working with David Abell and other BBD managers, the vendors used the

managers' P-Cards interchangeably to make it easier to generate fraud proceeds and bill SEPTA without exceeding the transactional limits on the individual P-Cards. The vendors thus used any manager's P-Card for transactions without regard for who was making a purchase or engaging in fraud with them.

Irvello and Woloff provided Abell with cash payments on a regular basis, approximately twice per month, from in or about 2013 until Abell left the employment of SEPTA on or about May 25, 2016.

Approximately one year before David Abell left the employment of SEPTA, he retired from his position as Senior Director of Maintenance and became a contractor for SEPTA, continuing to work in SEPTA's BBD as he did as a manager. SEPTA replaced Abell with Rodney Martinez (charged in a related case), making Martinez the new Senior Director of Maintenance. Abell trained Martinez in his new position and introduced Martinez to the cash-payment aspect of the fraud scheme.

Vendors Irvello and Woloff then made regular cash payments to Abell and Martinez and continued to falsely bill SEPTA for products that they did not provide to SEPTA, as described above. The false billing covered the cash payments to Abell and Martinez and provided fraudulent proceeds for the vendors.

Several other SEPTA BBD managers, including Brauner and those identified in paragraph 9 of the information, engaged in similar fraud activity with vendors Irvello and Woloff. Those managers solicited the vendors for cash and personal items at no cost to the SEPTA managers. The vendors agreed to provide the cash and personal items to the

7

managers, and as the parties further understood and agreed, the vendors fraudulently billed SEPTA to cover the cost of those payments and products and to generate additional fraud proceeds for the vendors.

From in or about 2013 through in or about 2019, Irvello and Woloff, through their companies, each became one of SEPTA's largest billers on the P-Card. In doing so, Irvello defrauded SEPTA of more than $540,000, and Woloff defrauded SEPTA of more than $330,000.

2. <u>Defendant Brauner's Involvement in the Scheme</u>

In 2016, Brauner began to participate in the fraud scheme against SEPTA. Brauner separately asked both Mark Irvello and Stanley Woloff to provide him with personal products at no cost to Brauner. Irvello and Woloff agreed to provide Brauner with those personal products. Brauner and the vendors understood and agreed that the vendors would use the SEPTA P-Cards to fraudulently bill SEPTA for those personal products and generate additional fraud proceeds for the vendors.

From in or about 2016 through in or about 2018, as part of this scheme, Brauner obtained from Irvello and Woloff numerous personal items that Irvello and Woloff fraudulently billed to SEPTA through the P-Card system. The total value of those products was approximately $19,646, resulting in approximately $33,050 in fraudulent billing to SEPTA. The products included, among others, a $5,175 backhoe attachment, a computer, a gas grill, and automobile parts.

8

### III. STATUTORY MAXIMUM PENALTIES

The Court may impose the following statutory maximum sentences: Count One (theft from an organization receiving federal funds), 10 years' imprisonment, a three-year period of supervised release, a $250,000 fine, and a $100 special assessment; Count Two (wire fraud), 20 years' imprisonment, a three-year period of supervised release, a $250,000 fine, and a $100 special assessment.

Total Maximum Sentence is: 30 years' imprisonment, a three-year period of supervised release, a $500,000 fine, and a $200 special assessment. Full restitution of $33,050 also shall be ordered. Forfeiture of $19,646, which represents all proceeds the defendant obtained from the fraud and bribery offenses, also may be ordered.

### IV. SENTENCING GUIDELINES

The government agrees with the guideline calculation set forth in the Presentence Investigation Report ("PSR") as follows: Under U.S.S.G. § 2B1.1(a)(1), the base offense level for the defendant's conduct is 7. Under U.S.S.G. § 2B1.1(b)(1)(C), the fraud loss caused and intended to be caused in furtherance of the criminal activity undertaken by the defendant was more than $15,000 but less than $40,000, resulting in a 4-level increase to the base offense level. Under U.S.S.G. § 3B1.3, the defendant abused a position of public trust, resulting in a 2-level increase to his base offense level. Because the defendant demonstrated acceptance of responsibility for his offense, he receives a 2-level downward adjustment under U.S.S.G. § 3E1.1(a). This results in a total offense level of 11. The

9

defendant is in Criminal History Category I, yielding a sentencing guideline range of 8 to 14 months.

**Consideration of the 3553(a) Factors**

**(1)     The nature and circumstances of the offense**

The nature and circumstances of Brauner's criminal conduct are serious. Brauner was a management employee with SEPTA who abused his position to defraud SEPTA through a credit card system designed to allow respected management employees to obtain necessary materials for important projects. Brauner betrayed the trust placed in him and deprived SEPTA and the citizens who rely on public transportation funds that should have been used for SEPTA's legitimate needs. Crimes like this do tremendous damage to federally funded agencies like SEPTA. They cause the taxpayers and citizens of Philadelphia to lose faith in the integrity of one of the largest metropolitan transportation organizations in the country. People are already cynical about government and government-funded entities like SEPTA, and internal fraud and bribery activity as charged in this case, fans the flames of this cynicism. Internally at SEPTA, these crimes demoralize the dedicated, honest, and hard-working employees who worked with and for the corrupt supervisors charged in this case. SEPTA has expended and will continue to expend substantial financial and psychic resources trying to repair the damage from the fraud and ensure that it does not happen again.[1]

---

[1] SEPTA has advised the government that intends to provide a victim impact statement that will further explain the impact that the criminal activity had on SEPTA.

10

### (2) The history and characteristics of the defendant.

Defendant Brauner is a 59-year-old resident of Philadelphia who had a good upbringing and is married with one child. He has had tremendous support from his family both before and after he was caught engaging in this fraud. The defendant has no drug, alcohol, or mental health problems. Unlike so many cases that come before this Court, the defendant's personal history does not offer any explanation for his decision to engage in this criminal conduct. Clearly, the defendant should have known better.

To the defendant's credit, when confronted by the government about this fraud (in the presence of his attorney), he admitted to his misconduct, expressed remorse, and agreed to pay full restitution before the time of sentencing. He has been fully cooperative in describing to the government the details of his criminal activity. He has conducted himself extremely well throughout the investigation and litigation of this case. The government's recommended below-guidelines sentence properly accounts for the defendant's history and characteristics.

### (3) The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; and

### (4) The need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant.

A sentence below the guidelines under all the facts and circumstances of this case (including those set forth in other sentencing documents) would appropriately punish the

defendant for defrauding SEPTA. The government also appreciates that the defendant is losing his pension as a result of the convictions here and intends to pay full restitution at sentencing. The penalties imposed in this case will promote respect for the law and deter public employees who might contemplate engaging in this type of fraud from doing so. Crimes like this are difficult to detect, as evidenced by the length of time that the defendant and others engaged in the fraud here. This Court needs to strongly deter those who would consider engaging this type of criminal behavior or otherwise abuse their positions as public employees. There are other participants in this scheme who have pleaded guilty and will face serious prison time, along with federal financial penalties and the loss of their state pension. In the case of this defendant, a more lenient sentence as recommended by the government, especially when considered with other sentences requested by the government in co-defendants' cases, will appropriately communicate to the public that the justice system will not tolerate this type of fraud activity.

**(5) The need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

There is no need in this case to provide the defendant, a skilled and experienced former maintenance manager, with educational or vocational training. Thus, this statutory factor should not affect the Court's sentencing determination.

**(6) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.**

Imposing a sentence below the guidelines would not result in any unwarranted

disparities. Given the defendant's modest guideline range and the other factors discussed in this memorandum and elsewhere, the recommended sentence would not result in any unwarranted disparities among similarly situated defendants. The recommended sentence fairly considers this defendant's conduct and circumstances of his case relative to that of his co-defendants, most of whom are more culpable than this defendant and will face substantially more serious sentences. Thus, this factor also supports the government's request for a below-guideline sentence.

    **(7)**     **The need to provide restitution to any victims of the offense.**

The defendant intends to pay restitution in full at the time of sentencing. This Court need not otherwise fashion a sentence that considers the need for the defendant to pay restitution.

    **V.**     **SENTENCING RECOMMENDATION**

For all the reasons set forth above, the government requests that this Court impose a sentence below the guideline range of 8 to 14 months. Such a sentence would properly reflect consideration of all the sentencing factors as well as the defendant's conduct after

he was confronted by authorities about the charged offenses.

.

                                          Respectfully submitted,

                                          JENNIFER ARBITTIER WILLIAMS
                                          United States Attorney


                                          *s/ Louis D. Lappen*
                                          LOUIS D. LAPPEN
                                          Deputy United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Government's Sentencing Memorandum has been filed on ECF and served via email upon:

>Gregory Pagano
>1315 Walnut Street
>Philadelphia PA 19107
>gpagano@paganolaw.net


>*/s Louis D. Lappen*
>LOUIS D. LAPPEN
>Deputy United States Attorney

Date:  February 11, 2022